Thank you. Good morning. May it please the Court, Joe Siguenza for petitioner this morning. In this Consolidated Immigration Appeal, there are two issues for the Court. Whether substantial evidence supports the Board's affirmation of the IJ's denial of asylum based on changed country conditions and a well-founded fear of persecution in Fiji. And the second issue is whether the Board abused its discretion in denying a motion to reopen based upon changed country conditions, specifically the December 2006 coup in Fiji. Essentially, if I may address the second issue first, the Board had denied the motion to reopen based on the December 2006 coup, finding that the evidence presented was, quote, not sufficient. And so the Board said, the Board erred in failing to take into account the history of Fiji. They looked at only the 2006 coup in isolation in a vacuum, if you will. And they failed to take into account the four coups since 1987. Fiji has endured over 20 years of systematic ongoing abuse.  Well, the recent coup. Yes. What was it about that or the result of that that would make it – that would cause Ms. Rani to have heightened her fear of returning? Yes. Petitioner's fear stems from volatile, unstable, uncertain conditions after the December 2006 coup. Doesn't that confront many people who are there in Fiji these days? It does, Your Honor. But if you take it into context and not just look at how the December 2006 coup affects perhaps both Indo-Fijians and Natives alike, but also in the context of more than 20 years of racial discrimination and abuse by Natives against Indo-Fijians, if you take that into context, which the Board, we submit, failed to do, Petitioner would – Petitioner has, rather, a well-founded fear of returning to Fiji. Can I ask something? I'm confused in background. Yes. I thought we had both a Petition for Review from the original denial and also a Petition for Review from the denial to reopen. Am I wrong about that? No, Your Honor. But you only mentioned the Petition to reopen. Yes. I was addressing the second issue first, the December 2006 coup. If I'm – You want to address the motion to reopen. That's what your focus is right now. Yes. That the Board abused its discretion in failing to grant the motion to reopen, correct? That's correct, Your Honor. All right. And, Your Honor, I will address the other component of the appeal. You didn't mention it even at the outset, so I was confused. Oh, well, the first issue is whether substantial evidence supports the Board's And then while that appeal was pending, Petitioner brought a motion to reopen based on the December 2006 coup and they were consolidated. Okay. All right. Go ahead. Thank you. Again, with respect to the December 2006 coup, if you look at it in context of 20 years of racial abuse and discrimination, the Board appears to have assumed that these 20 years of racial violence were no longer – no longer existed. Well, nothing happened after the 2006 coup, did it? I'm sorry? Did anything actually happen after the 2006 coup? Well, there was a lot of uncertainty and instability. Exactly. But nothing happened? Nothing specifically against Indo-Fijians, Your Honor. All right. Petitioner concedes that point. But, again, if you look at it in context of 20 years of – of racial violence and abuse, it would seem that – I'm just totally baffled about why you think you're going to get some place on the petition. Well, Your Honor, we would – we would submit that perhaps a remand is in order. But we just don't remand to be remanded. It has to be a reason to remand. I understand, Your Honor. Let me – let me ask you a question that concerned me when I read the record. So on the original merits determination, there was an appeal to the Board. And the Board – there was no brief that was submitted by the Petitioner in support of that appeal, and the Board dismissed it for failure to submit a brief. We then handed down a decision that said, well, the Board can't do that. You've got to address the issues raised in the notice of appeal, right? Yes. So we remanded it back to the – to the BIA and said, address these issues. And some – for some reason or other, it ends up back at the – at the IJ dealing with changed country conditions. In that process there, her original claim of past persecution seems to have dropped out of the picture. Is that because you concede that there was no past persecution, or was there just an oversight, or what? More an oversight, we would submit, Your Honor. It was interesting why the Board remanded to the IJ at that particular point in time instead of addressing the issue on remand. But nobody's ever – there's never – the IJ found initially no past persecution, correct? Correct. Okay. That Board – that issue has never been appealed to the Board, reviewed by the Board. Is that right? That's correct. And I believe – But what has been reviewed by the Board is a disfavored group-slash-pattern or practice claim. Yes. And that's the other issue that perhaps I could take a couple of minutes to address. Petitioner would submit that based either on the – either a pattern or practice of persecution theory or a disfavored group analysis – Well, you're showing that the pattern or practice isn't going to work. But as to disfavored group, what is your understanding – this is my – this is where I think the legal issue is in this case. You – there's lots of evidence of discrimination and mistreatment. There's not a lot of evidence in the record, although we have other cases that seem to talk about persecution against Indo-Easians. So what do you need to show to come within the disfavored group analysis, which is just kind of a – according to later cases, kind of a weight in the scale with regard to finding a likelihood of future persecution. But what do you need to show to show that? Essentially, per the Sael and Sinha cases, my understanding is that in order to – Well, there are later cases. I don't know why everybody's ignoring them, but Lockery and so on. But go ahead. For disfavored group analysis, my understanding is that discriminatory acts can be persecution if they're widespread. And if you have violence with a distinct racial slant, you're not disenfranchisement. Okay. That's what I want to know. Where is this in the record? I don't know that that was fully developed, Your Honor, by the I.J. at that time. And perhaps a remand would be appropriate to further develop that. Well, it's not the I.J.'s point. It's your problem. You have to put on – or I don't know if you represented these people in the original I.J., but somebody has to put on a record showing that there was – it meets that standard. Or do they? Or could we go back to earlier cases in this Court and say, oh, look, we can find a fair number of cases in which this happened? Well, Your Honor, I believe that there's a sufficient factual record based upon the 2002 proceedings and the 2006 proceedings that show that Respondent, or rather Petitioner, was part of this disfavored group, Endophagy and Sports After Persecution. But you haven't proved it's a disfavored group. That's the problem. I'm sorry? What do you have to show to show it's a disfavored group, and have you shown it? You have to show – well, my understanding, again, Your Honor, is that you need a lesser showing of individualized persecution. I know it's lesser of individualized persecution, but what do you need to show that it is a disfavored group to get to that point? You have to show that she is part of, in this case, based on her ethnicity as an Endophagian and the history of 20 years of persecution of Endophagy. Well, that's what I want to know. Where is the history of 20 years of persecution as opposed to 20 years of mistreatment and discrimination? Where is that in the record? Or somewhere else, where is it that we could deal with that? I can't think offhand of a portion of the A.R. that addresses that. Perhaps on rebuttal I could address that. Why don't you save the one minute that you have for rebuttal, and you can come up with anything you can present it to us on rebuttal. Certainly. Let's hear from the government. Thank you. Good morning, Your Honors. May it please the Court, Jem Sponzo on behalf of the Respondents. Your Honor, I'll start with precisely the point you were just addressing. In his decision, after this Court's remand, after the Board returned the case to the immigration conditions, the immigration judge found, and I quote here, the unfortunate long history of discrimination and social unrest between Fiji's 51 percent native population and 42 percent Indo-Fijian population is well documented in the record. Nevertheless, Petitioner has failed to demonstrate that she would be anything other than a victim of discrimination or crime were she to return to Fiji at the present time. And so I'm wondering if you could comment on that, because I think it's a very important point. I think it's a very important point, and I think it's a very important point. There's still a little gap in logic there, but the BIA did seem to address it directly, because it says, as I understand, it noted that there's a disfavored group possibility and then says, but they haven't identified ongoing violence against Indo-Fijians. So my understanding is that they seem to be saying that she hasn't met the standard of showing it's a disfavored group. Exactly, Your Honor. What we have is a record replete with indicia of both groups, native Fijians and Indo-Fijians, claiming disfavored status, claiming difficulty suffered at the hands of the other, and asserting, as did Petitioner, discrimination and problems such as burglaries, such as being made fun of in their workplaces, as Petitioner claimed her brother was. On the record that we have, those are not the types of incidents that we have in the    of incidents that we have in the case that would constitute the level of harm necessary, the type of mistreatment that we look for in these sorts of cases. And what about when she was attacked and mugged and they said she was ‑‑ and they called her names? You seem to kind of downplay that. It does seem to me to be a racially-based incident. It certainly was, Your Honor, and we do not ‑‑     And I do not believe that that's a serious question, that that's a serious problem, that's a serious crime, that's a serious issue, just as it would be categorized in this country. But after that incident, Petitioner claimed that the police did nothing. It's not entirely true. And it's very important for how we might assess her claim in its entirety. Petitioner said she called the police, she told them what had happened. They took her call. They came to her home. They took her statement and at that point informed her that there was nothing they could do. That's the record that we have. Those are the facts before us that must be ‑‑ But when she called them another time, they said, you Indians are always complaining and we're not going to do anything. Correct. We do have that elsewhere in the record. But to take that most severe incident in its entirety, unfortunately, here it ends with the police doing everything they needed to. And informing her at the end that there was simply nothing that they could do, just as we might have here in this country. Sorry, let me just try to review. Quite simply, to reach the disfavored group analysis, which as Your Honor said is dispositive here, Petitioner has just failed to make a showing of the necessary elements. Petitioner can see the difference that we have in at least several cases of interference between individuals who do show persecution, or who helped show persecution. I'm sorry, Your Honor, I missed the first part of your question. We do have several cases in which Indovigians have shown persecution, in some sense that it's, you know, not all that unusual. Does that have any relevance to the disfavored group or does it have to be in each record separately? Each record separately, Your Honor. That's very important. It has all the relevance in the world to whether this type of showing can be made. Could there be a successful disfavored group claim? Absolutely. But this is a very close divide of the population. As the immigration judge noted, it's 51 percent of the Native Fijians, 42 percent of the Indovigian population. And as Petitioner has conceded, the record before this Court fails to prove the type of repeated discriminatory acts that we saw, for example, in Sale and in those subsequent Indovigian cases that would lead to a disfavored group finding. We just don't have that here. And perhaps it's helpful that in the motion to reopen, which is also before this Court, there cannot be any abuse of discretion by the Board in denying that motion because it quite simply fails to meet the materiality prong. The evidence submitted with that motion was admittedly previously unavailable, but it was not material to Petitioner's claim. As Your Honors noted, it failed to show that the situation for Indovigians had changed. It's very important, both in looking at Petitioner's asylum claim and related relief and at her motion to reopen. The Board properly concluded, simply put, that Petitioner had failed to show that she faced some changed, altered risk of persecution upon her return and that the record was, albeit, replete with indicia that unrest accrued following the coup and the situation there was difficult, but not specifically for Indovigians. That's the relevant inquiry in this case, just as it is in all others in which a disfavored group requests made or in which the relief sought is based on a claim of membership in a disfavored group. Simply put, Petitioner failed to meet her burden unidentified. Kagan. Kagan. I'm a little confused about it. I don't know how relevant it is. But you said that the policeman came to our house and took a statement, but I thought you said that she reported to the police and a Fijian policeman said he could do nothing, and what could he have done? Well, at least he could have taken my statement, and so she says he didn't. I apologize if I misspoke, Your Honor. My citation is to page 1098 of the Certified Administrative Record. I'm referencing the Certified Administrative Record filed with the second petition for review, such that the record in its entirety is set forth, and I believe the facts there provide that the police took Petitioner's call, that they came to her home, and subsequently told her that there was nothing they could do. And so he didn't even take my report or anything? No. I'm reading. And so he didn't even take my report or anything? My apologies, Your Honor. I then misspoke in indicating that a statement was taken. But at a minimum, that type of experience with the police, the third – the admitted investigation that they did undertake cannot be construed as a flat unwillingness to consider her claim, as a flat unwillingness to engage in any investigation at all. Was there any evidence as to why the police couldn't do anything? There is not, Your Honor, either way. No evidence that it was because she's Indo-Fijian, no evidence that it was perhaps because there was simply insufficient evidence to go forward. And similarly, with respect to the other incidents upon which Petitioner bases her claim, the theft of her sister's crops, the fact that her brother's colleagues make fun of him in the workplace, there is nothing beyond Petitioner's word we have on this record. And Petitioner conceded, when asked, that no one saw that these were Native Fijians stealing the crops from her sister. Quite simply, this is just not a case in which a disfavored group showing has been made, nor is there any indication that the Board abused its discretion in denying her motion to reopen. Are there any further questions? Thank you so much. If I may address the Court's inquiries about whether the police took reports of incidents claimed by Petitioner. At AR 672, the record shows that the police did not take a report, and the record establishes, at a minimum, an indifference or an unwillingness to assist Petitioner. Also at AR 80-81 and 84, there is a factual record, I would submit, that supports Petitioner's claim of how this 2006 coup has affected her and her family back in Fiji. And she does detail incidents of – incidents suffered by her family and relatives, including her brother and sister. We would submit that there is a sufficient factual record there to support the motion to reopen. What was the instance? That would be at AR 80-84, Your Honor. But what were the – I don't have that right here at this moment. What were the incidents? Essentially that an Indian neighbor's home was burglarized. Here, you'll have it, actually. Her brother and his coworkers were enduring verbal abuse every day, made it difficult for them at the workplace. Also that her sister's crops were stolen at harvest time. And also that her sister reported the theft to the police, but nothing was done. I thought this was before – I'm sorry. I thought the testimony in pages 80 to 86 was before 2006. It all is. It's January 2006. I apologize, Your Honor. I believe I stand corrected. I believe that in her motion to reopen affidavit, she does detail, not a lot of specificity, but she does detail some incidents that have affected her. You're over your time. Thank you. Thank you. Lonnie v. Holder will be submitted at this time. Our next case for argument is Sharma v. Holder. Thank you.
judges: Paez, Berzon, Bea